THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS A. GARZA, Defendant-Appellant.

Second District    No. 2—97—0470

Opinion filed August 12, 1998.

Timothy K. Mahoney and Nils Von Keudell, both of McNamee & Mahoney, Ltd., of Dundee, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and

Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

On July 9, 1996, defendant, Jesus Garza, was arrested in connection with the beating and armed robbery of Antonio Martinez. After a bench trial, the trial court convicted defendant of armed violence, armed robbery, aggravated battery, unlawful possession of a weapon by a felon, possession of a firearm without a firearm owner's identification (FOID) card, and mob action. On appeal, defendant raises the following contentions: (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) his sentences for armed violence and possession of a firearm without a FOID card violate the proportionate penalties clause of the Illinois Constitution; and (3) his armed violence conviction is invalid because it was the product of impermissible double enhancement.

At trial, Antonio Martinez testified that, around 3:45 p.m. on July 9, 1996, he drove to the Union 76 gas station at the corner of Dundee and Franklin in Elgin in order to make a call at the pay phone there. As he was talking on the phone to his friend Delores Espinoza, he observed a gray car drive past the gas station. He recognized the three individuals in the car. Defendant's brother Christian Garza (Christian), also known as "Rambo," was driving the car. Defendant, also known as "Chewy," was sitting in the front passenger seat, and Jose Arizmendi, also known as "Curious," was sitting in the backseat. Martinez knew defendant and Christian because they were members of the Latin Kings and, until a few years before trial, Martinez had been a member of the Maniac Latin Disciples, a rival gang. In addition, he had previously called the Garza brothers' house to speak to their 15-year-old sister.

As they drove by Martinez, the three occupants of the car shouted names at him, such as "pussy" and "bitch." Martinez did not respond. Thirty seconds to a minute later, he observed the car driving back toward the gas station from the opposite direction. It stopped next to the station in the middle of Franklin Street.

Defendant then exited the car from the front passenger seat and began walking toward Martinez. As he approached Martinez, defendant pulled a five-inch-long pistol from his clothing. He cocked and pointed the pistol at Martinez and said, "[W]hat's up now, bitch." Martinez said nothing in response but dropped the phone and put his hands up. Although he did not make any movement toward defendant, defendant hit him on the head with the pistol, knocking him to the ground.

After Martinez fell to the ground, Arizmendi and Christian exited the car. They and defendant proceeded to punch and kick Martinez. Martinez could not tell if defendant was hitting him with the gun during this time, but at some point defendant dropped the gun. Martinez attempted to retrieve it, but Arizmendi immediately grabbed it. While Martinez was on the ground, one of his three attackers tore the gold chain and medallion Martinez was wearing from his neck. Defendant, Christian, and Arizmendi then ran to their car and drove away.

After firemen treated Martinez for his injuries, he accompanied police officer Chad Van Mastrigt to the Elgin police station. At the station, he was shown three photographic lineups. In the first lineup he identified Christian as one of his attackers; in the second he identified Arizmendi, and he selected a photograph of defendant from the third lineup.

Martinez denied that Espinoza visited his house on the day of the beating. Although he testified that she came to his house a few days later, he denied talking to her about the beating. Martinez also admitted that he is a convicted felon.

Delores Espinoza testified that, during the afternoon of July 9, 1996, Martinez called her from a pay phone. She knew Martinez because he was a Maniac Latin Disciple in July 1996, and her brothers were in the same gang. She denied being a member or associate of a gang.

While Espinoza was talking to Martinez on the phone, in addition to his voice, she heard "a lot of people yelling" and saying things to provoke Martinez. She recognized one of the voices as "Chewy's." She heard "Chewy" call Martinez a "bitch" and ask him if he wanted to fight. In response, Martinez yelled "pussy-ass Kings" and "bitch."

Later that day, Espinoza gave a taped statement to police. She told police that the voice she recognized during the phone call belonged to "Chewy." Although she testified at trial that in July 1996 she thought that "Chewy" was Jose Arizmendi's nickname, she admitted telling police that "Chewy" was defendant. Also, after testifying that she had known defendant only for about a year, she admitted telling police in 1996 that she had known him for three or four years.

Espinoza further testified that, after leaving the police station on July 9, she visited Martinez's house. Martinez showed her his gold chain and medallion and stated, "[Y]ou thinking I'm gonna let those motherf----- take my chain." He also told her that his attackers did not have a gun. Espinoza testified that she subsequently told "Officer Schultz" what Martinez had said, and he told her that she could just change her statement when she testified.

Espinoza acknowledged that she had been adjudicated a delin-

quent minor and, shortly after July 9, 1996, had spent time in a youth home. She admitted that she saw Jose Arizmendi at the youth home, but stated that they were prevented from talking because Espinoza had been subpoenaed to testify in connection with defendant's trial.

Elgin police officer Chad Van Mastrigt testified that on July 9, 1996, he was dispatched to the Union 76 station. The station, which included a convenience mart, was open to the public, had places for parking, gas pumps, and two public pay phones. When Van Mastrigt arrived at the station, Martinez was being treated for head wounds by the fire department. Van Mastrigt spoke to Martinez about the beating but did not find any weapon in the area and was unable to find any witnesses to the events Martinez described. Van Mastrigt then accompanied Martinez to the police station, where Martinez identified defendant, Christian, and Arizmendi from three different photographic lineups he was shown at the station.

Elgin police officer Jeffrey Adam testified as a gang expert. He stated that, based on his contact with defendant, Christian, and Jose Arizmendi, he knew that all three were members of the Latin Kings. According to Adam, "Chewy" was defendant's nickname, not Jose Arizmendi's.

Adam also testified that, based on his contact with Martinez, he knew that Martinez was a member of the Maniac Latin Disciples. According to Adam, Martinez was not an active member of this gang in July 1996 because he had fallen out of favor with the gang for cooperating with police, but he became an active member again about a month before trial. The Union 76 station was in Maniac Latin Disciple territory. Adam also testified that Espinoza was a member of the Lady Disciples, although she was not an active member at the time of trial because the gang was defunct.

In addition to this testimony, the State presented a stipulation that defendant had been convicted of a burglary, a Class 2 felony, in 1994.

After the State rested its case, the trial court denied defendant's motion for a directed verdict. Defendant then began his case in chief with the testimony of Christian Garza. Christian testified that on July 9, 1996, he was driving a car in which defendant and Arizmendi were passengers. Defendant was riding in the front passenger seat. After stopping at a car repair shop and his girlfriend's house, Christian drove on Dundee toward his house.

As they were driving past the Union 76 station, they heard Martinez, who was using a phone at the station, scream at the car. No one in the car said anything to Martinez, but Christian drove to the entrance of the station to see what Martinez wanted. Defendant, who

was angry, then exited the car to talk to Martinez, who was still yelling.

Christian testified that, as defendant approached Martinez, Martinez swung the phone receiver at defendant and hit him in the head. On cross-examination, however, he testified that the phone cord was only 18 to 24 inches long and that defendant was standing three to four feet from Martinez when Martinez struck him with the receiver.

Christian further testified that, after Martinez hit defendant with the phone receiver, defendant hit Martinez in the face with his hand. Martinez then tripped and fell to the ground, and defendant, who had positioned himself on top of Martinez, continued "pounding on his face." Defendant then jumped back in the car, where Christian and Arizmendi had remained, and they drove to defendant's girlfriend's house. According to Christian, defendant did not have a gun during the fight. Christian admitted that, as a juvenile, he had been convicted of aggravated battery.

Similarly, defendant testified that, as they drove past the Union 76 gas station, they saw Martinez at a pay phone and Martinez began yelling at them. They drove into the parking lot of the gas station, and defendant exited the car and walked toward Martinez. Defendant explained that, when he stopped at the gas station, he knew that there was going to be a fight between him and Martinez because Martinez had been harassing his family. Defendant was angry because Martinez had called his house and asked to speak to defendant's sister. When he saw Martinez, he planned to beat him up to keep him away from his sister.

As he approached Martinez, defendant said, "[W]hat's up." Martinez replied "[W]hat's up" and threw the phone receiver at him, hitting him on the side of the face. Defendant then put his hand in front of his face, but Martinez "came at" him. Defendant punched Martinez in the face so hard that he fell to the ground. He then kicked Martinez a few times and punched him in the face. Martinez attempted to hit defendant, but he could not because defendant was on top of him. Defendant then ran back to the car.

According to defendant, he did not have a gun, and Christian and Arizmendi remained in the car during the fight. Defendant also denied taking Martinez's gold chain and medallion.

After defendant's testimony, the defense rested its case. As rebuttal, the State presented a stipulation that, if called to testify, Officer Van Mastrigt would testify that when defendant was arrested there was no visible injury to his face.

The trial court found defendant guilty of armed violence, armed robbery, robbery, two counts of aggravated battery, unlawful posses-

sion of a weapon by a felon, possession of a firearm without a FOID card, and mob action. It entered judgment on all counts but one of the aggravated battery counts and the robbery count. It found that one of the aggravated battery counts merged with the verdict on the armed violence count and that the robbery count merged with the verdict on the armed robbery count. The trial court sentenced defendant to 15 years' imprisonment for the armed violence conviction, 6 years for armed robbery, 4 years for aggravated battery, 5 years for unlawful possession of a weapon by a felon, 2 years for possession of a firearm without a FOID card, and 3 years for mob action. The sentences were to run concurrently. The trial court denied defendant's motions for a new trial and for reduction of sentence.

■ Defendant's first contention on appeal is that the evidence was insufficient to sustain his convictions. The relevant inquiry when reviewing a sufficiency of the evidence argument is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Dunskus*, 282 Ill. App. 3d 912, 918 (1996). A reviewing court will not reverse a conviction unless the evidence is so improbable as to create a reasonable doubt with respect to defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A conviction may be upheld based on the testimony of a single witness, if positive and credible, even if this testimony is contradicted by the defendant. *People v. Grano*, 286 Ill. App. 3d 278, 290 (1996).

■ Defendant argues that the evidence was insufficient to support his conviction of armed robbery. According to defendant, it was error for the trial court to "ignore" testimony by him, Christian, and Espinoza and choose to believe instead Martinez's testimony about the gold chain. A reviewing court, however, cannot substitute its judgment for that of the trier of fact with respect to the weight of the evidence and the credibility of the witnesses. *People v. Draheim*, 242 Ill. App. 3d 80, 88 (1993). The trier of fact is in the best position to assess the credibility of the witnesses, to determine the weight to be given to their testimony, and to resolve any conflicts in their testimony. *People v. Schoenneman*, 237 Ill. App. 3d 1, 4-5 (1992).

■ Based on these principles, we refuse to overturn the trial court's determination that Martinez's testimony about the facts on which the armed robbery conviction was based was more credible than the testimony of defendant, Christian, and Espinoza. In addition, we note that the trial court's credibility determinations are supported by the record.

As the trial court found, defendant's and Christian's descriptions of the confrontation were inconsistent with each other. While Chris-

tian testified that Martinez fell to the ground during the fight because he tripped, defendant testified that he punched Martinez so hard that it caused him to fall to the ground. Defendant's and Christian's testimonies were also inconsistent with Espinoza's testimony. Although they testified that Christian and Arizmendi remained in the car during defendant's fight with Martinez and did not yell anything at him, Espinoza testified that she heard "a lot of people yelling" during her conversation with Martinez.

Other aspects of defendant's and Christian's testimonies also suggest that Martinez's description of the attack was the more credible version. For example, defendant and Christian testified that Martinez dealt the first blow in the fight by hitting defendant in the face with the phone receiver. The phone cord, which was only 18 to 24 inches long, however, would have prevented Martinez from reaching defendant with the receiver if, as Christian testified, defendant was standing three to four feet from Martinez at the time of the blow. The fact that defendant had no visible facial injuries when he was arrested later that day also undermines the claim that Martinez struck him in the face with the phone receiver.

Moreover, defendant's own testimony shows that he was the aggressor in the fight. Martinez was making a phone call in his own gang's territory when defendant and his companions stopped, admittedly to fight him because of Martinez's efforts to contact defendant's sister.

Martinez's testimony, on the other hand, did not contain similar discrepancies. Although the trial court found that his credibility was shaken by the fact that he was a convicted felon and had lied about his gang membership, it believed his testimony about the beating and robbery because the facts Martinez related were corroborated. For example, defendant's and Christian's testimonies corroborated Martinez's testimony that defendant was the aggressor in the fight, that defendant knocked him to the ground, and that defendant then repeatedly punched and kicked him.

In addition, Espinoza's testimony that she heard several voices yelling during her phone conversation with Martinez corroborated Martinez's testimony that Arizmendi and Christian were also involved in the attack. Although Espinoza did contradict Martinez's testimony that defendant had a gun and that his gold chain was stolen, the trial court was justified in finding Espinoza unbelievable with respect to these subjects, given that she did not include this information in her original statement to police.

Based on the record and the deference we must give to the trial court's credibility determinations, we do not find the evidence insufficient to sustain defendant's conviction of armed robbery.

■ We also reject defendant's assertion that the evidence was insufficient to support his conviction of armed violence. According to defendant, his conviction of aggravated battery under section 12—4(b)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/12—4(b)(1) (West 1994) (use of a deadly weapon in committing a battery)) was based on the act of striking Martinez with the pistol. Therefore, this act could not have formed the basis for his armed violence conviction, which was predicated on the felony of aggravated battery under section 12—4(b)(8) of the Code (720 ILCS 5/12—4(b)(8) (West 1994) (battery on or. about a place of public accommodation)). Instead, his armed violence conviction must have been based on the acts of punching and kicking Martinez. However, defendant contends that he was not armed at the time he punched and kicked Martinez because he dropped the pistol after striking Martinez with it. Because the evidence failed to establish that he was "armed with a dangerous weapon" at the time he performed the acts on which his armed violence conviction is based, defendant asserts that this conviction must be reversed. We disagree.

Since defendant and Christian denied that there was a pistol involved in the fight, the only testimony about the pistol came from Martinez. Contrary to defendant's assertion, Martinez did not testify that defendant dropped the pistol immediately after striking him with it. Instead, Martinez testified to the following sequence of events: defendant hit him with the pistol, he fell to the ground, Christian and Arizmendi exited the car, they and defendant punched and kicked him, he saw the pistol hit the ground, and Arizmendi retrieved it and ran for the car. This testimony permitted a rational trier of fact to conclude that the gun was dropped toward the end of the beating and that defendant was, therefore, armed at the time he performed the acts on which his armed violence conviction was based.

Finally, we hold that defendant's challenge to the sufficiency of the evidence supporting his mob action conviction is without merit. According to defendant, his conviction of mob action must be reversed because there is no evidence that the public peace was disturbed. In support of this argument, defendant asserts that Officer Van Mastrigt could locate no occurrence witnesses and, therefore, the "public" element is missing. As the State correctly notes, however, acts constituting mob action need not occur in public view. See *People v. Dixon*, 91 Ill. 2d 346, 354 (1982).

Next, defendant claims that his armed violence conviction must be reversed because it is disproportionate in violation of article 1, section 11, of the Illinois Constitution of 1970, which provides, "All penalties shall be determined *** according to the seriousness of the offense ***." Ill. Const. 1970, art. I, § 11.

In arguing that the penalty for armed violence based on battery on or about a place of public accommodation while armed with a pistol is disproportionate, defendant compares it to the penalty for aggravated battery with a firearm and aggravated discharge of a firearm. The mandatory minimum sentence for armed violence is 15 years' imprisonment (see 720 ILCS 5/33A—3(a) (West 1994)), while the minimum sentence for aggravated battery with a firearm is 6 years (see 720 ILCS 5/12—4.2(a)(1), (b) (West 1994); 730 ILCS 5/5—8—1(a)(3) (West 1994)), and the minimum sentence for aggravated discharge of a firearm is 4 years (see 720 ILCS 5/24—1.2(a)(2), (b) (West 1994); 730 ILCS 5/5—8—1(a)(4) (West 1994)). Defendant argues that, because it is more serious to actually shoot at someone with a firearm than to commit a battery while armed, it is unconstitutional for the penalty for the latter to be greater.

■ Legislative enactments are presumed constitutional, and a party bringing a constitutional challenge has the burden of establishing a constitutional violation. *In re S.G.*, 175 Ill. 2d 471, 486 (1997). The legislature has wide discretion to set the penalties for defined offenses, and a penalty will not be invalidated unless it clearly exceeds the very broad constitutional limitations that apply. *People v. McGee*, 257 Ill. App. 3d 229, 232 (1993). Because the legislature is better able to gauge the seriousness of different offenses, courts will not interfere with its judgment with respect to criminal penalties unless the punishment is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community. *People v. Caballero*, 237 Ill. App. 3d 797, 809 (1992).

Defendant relies on several cases in which courts have found a penalty disproportionate because an identical offense was punished less severely. See, *e.g.*, *People v. Lewis*, 175 Ill. 2d 412 (1996); *People v. Christy*, 139 Ill. 2d 172 (1990); *People v. Beard*, 287 Ill. App. 3d 935 (1997). In *People v. Lewis*, 175 Ill. 2d 412, for example, the supreme court held that it was unconstitutional to punish armed violence more harshly than armed robbery because the elements of these offenses were the same. The defendant in that case had been charged with both armed robbery, for which there was a mandatory 6-year minimum sentence, and armed violence based on robbery with a category I weapon, for which there was a 15-year mandatory minimum sentence. The supreme court found that these were identical offenses because the commission of a robbery with a handgun also constitutes armed violence. Because armed violence based on the commission of a robbery with a handgun was punished more harshly, the court held that this penalty violated the proportionate penalties clause. *Lewis*, 175 Ill. 2d at 418.

In the case before us, by contrast, the offenses defendant asks us to compare are not identical. Proof that an offense occurred on or about a public place of accommodation is not required for a defendant to be convicted of aggravated battery with a firearm or aggravated discharge of a firearm. Likewise, proof that a firearm was discharged is not required for an armed violence conviction predicated on a violation of section 12—4(b)(8). See 720 ILCS 5/12—4(b)(8), 12—4.2(a), 24—1.2(a)(2), 33A—2 (West 1994).

●6 Accordingly, cases involving a comparison of identical offenses do not govern the outcome of this case. As defendant acknowledges, this case involves the comparison of different offenses. Thus, a "cross-comparison" analysis applies. See *People v. Davis*, 177 Ill. 2d 495, 504 (1997). Under this analysis, we must determine whether conduct that creates a less serious threat to the public health and safety than other conduct is punished more harshly. See *Davis*, 177 Ill. 2d at 504-05.

Contrary to defendant's argument, the degree of harm is not the only factor to be considered in determining the seriousness of an offense. See *People v. Lee*, 167 Ill. 2d 140, 146 (1995). The legislature may choose to punish a particular crime more harshly based on other factors, such as the frequency of the crime, the need to halt an increase in the commission of that crime, or the high risk of bodily harm associated with the crime. *Lee*, 167 Ill. 2d at 146.

■ Here, the legislature could have reasonably concluded that, because of the risk of bodily harm to members of the public, it was necessary to punish armed violence based on battery on or about a place of public accommodation more severely than aggravated battery with a firearm or aggravated discharge of a firearm. Although, of course, there is a high risk of bodily harm associated with discharging a firearm, a battery committed by an armed individual also carries with it a high risk of injury, and the risk that someone will be injured in the course of that battery is multiplied when the battery occurs in public. In other cases, we have upheld the legislature's efforts to attach severe penalties to offenses committed in public because of its legitimate interest in protecting public safety. See *People v. Buie*, 217 Ill. App. 3d 786, 789 (1991) (a battery that occurs in public poses a greater threat to the community than battery that is not committed in public and therefore is a valid aggravating factor); see also *People v. Cole*, 47 Ill. App. 3d 775, 780 (1977). Because we cannot conclude that the penalty for armed violence based on a battery on or about a place of public accommodation is " 'so disproportionate to the offense that it shocks the moral sense of the community or is cruel or degrading' " (*People v. Johns*, 153 Ill. 2d 436, 449 (1992), quoting *People v. Bryant*, 165 Ill. App. 3d 996, 1000 (1988)), we hold that it does not violate the proportionate penalties clause.

Defendant also argues, however, that his conviction of armed violence must be reversed because it was based on impermissible "double enhancement." The State responds that defendant waived this issue by failing to raise it before the trial court and by failing to include it in a posttrial motion. Waiver aside, we find that there was no double enhancement and refuse to reverse defendant's armed violence conviction on this basis.

■ "Double enhancement" occurs when an aggravating factor used to enhance an offense or penalty is used again to subject the defendant to further enhancement of an offense or penalty. *People v. Thomas*, 171 Ill. 2d 207, 223 (1996). According to defendant, the fact that his battery of Martinez occurred on or about a place of public accommodation was used twice, once to enhance the charge against him from battery to aggravated battery and again as a basis for his armed violence charge because the underlying felony for his armed violence charge was aggravated battery under section 12—4(b)(8) (battery committed on or about a place of public accommodation).

In support of his double enhancement argument, defendant relies on *People v. Haron*, 85 Ill. 2d 261 (1981), and *People v. Bragg*, 126 Ill. App. 3d 826 (1984). In both of those cases, the courts held that aggravated battery under section 12—4(b)(1) (use of a deadly weapon in committing a battery) may not serve as the predicate felony for an armed violence conviction. This is because, under those circumstances, the involvement of a deadly weapon is used twice, once to enhance the battery offense from a misdemeanor to a felony and again as the basis for the armed violence charge. See *Haron*, 85 Ill. 2d at 278; *Bragg*, 126 Ill. App. 3d at 834-35.

■ When an armed violence charge is premised on aggravated battery under a section other than section 12—4(b)(1), however, courts will not find double enhancement. For example, in *People v. Hugues*, 230 Ill. App. 3d 192, 199-200 (1991), the court held that there was no double enhancement when the defendant's armed violence conviction was predicated on a battery causing great bodily harm in violation of section 12—4(a). See also *People v. Miller*, 284 Ill. App. 3d 16, 21-23 (1996); *People v. Damnitz*, 269 Ill. App. 3d 51, 61-62 (1994).

In this case, there was no double enhancement. An examination of defendant's indictments indicates that the predicate felony for his armed violence conviction was aggravated battery under section 12—4(b)(8) (battery on or about a place of public accommodation). He was also charged separately with aggravated battery under section 12—4(b)(8). The trial court did not enter judgment on this aggravated battery charge, however, because it found that it merged with the verdict on the armed violence count. Although defendant was convicted of ag-

gravated battery, this conviction was based on the aggravated battery charge under section 12—4(b)(1) (use of a deadly weapon in committing a battery).

Contrary to defendant's argument, therefore, the fact that the battery occurred on or about a place of public accommodation was not used as an aggravating factor twice. It was used only once, as the basis for the felony on which the armed violence conviction was predicated. Thus, there was no double enhancement.

■ Although we affirm defendant's convictions of armed violence, aggravated battery, armed robbery, unlawful possession of a weapon by a felon, and mob action, we reverse his conviction of possession of a firearm without a FOID card. In *People v. Davis*, 177 Ill. 2d 495, 508 (1997), the supreme court held that the penalty for violations of section 2(a)(1) of the Firearm Owners Identification Card Act (430 ILCS 65/2(a)(1) (West 1994)) violates the proportionate penalties clause of the Illinois Constitution when compared to the penalty for unlawful use of a weapon by a felon. Based on this case, the State concedes that defendant's conviction of possession of a weapon without a FOID card must be reversed.

The judgment of the circuit court of Kane County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

THOMAS and HUTCHINSON, JJ., concur.